Matthew Langley, CA Bar No. 342846
matt@almeidalawgroup.com
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Tel: (312) 576-3024

*Attorneys for Plaintiff & the Class*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lauren Wolf-Bond, *individually and on behalf of all others similarly situated*, <br><br> *Plaintiff,* <br><br> v. <br><br> SPD SWISS PRECISION DIAGNOSTICS GMBH d/b/a CLEARBLUE, <br><br> *Defendant.* | Case No.: 2:24-cv-06525-WLH-E <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **1. VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE §§ 630,** *et seq.* <br><br> **[JURY TRIAL DEMANDED]** |

1.    Plaintiff Lauren Wolf-Bond ("Plaintiff") brings this first amended class action complaint, on behalf of herself and all others similarly situated, against Defendant Swiss Precision Diagnostics GmbH d/b/a Clearblue ("SPD"). The allegations set forth herein are based on Plaintiff's personal knowledge, upon due investigation by her counsel and, where indicated, upon information and good faith

belief. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery.

## INTRODUCTION

2.  Plaintiff brings this case to address Defendant's unlawful practice of disclosing Plaintiff's and Class Members' confidential personally identifiable information ("PII") and personal health information ("PHI") (collectively referred to as "Private Information") to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook") and Alphabet, Inc. ("Google"), without consent, through the use of tracking software that is embedded in Defendant's website for Clearblue products.

3.  Defendant SPD is a Swiss company that produces a variety of advanced consumer diagnostic products, under several different brands, including Clearblue-branded pregnancy testing kits. Clearblue products include test kits for several sensitive health conditions, including fertility, ovulation and pregnancy status.[1]

4.  In order to market and sell their products, Defendant owns and controls https://www.clearblue.com/ (the "Website"), which it encourages customers to use for reviewing and purchasing pregnancy, fertility and ovulation test kits.

5.  Unbeknownst to customers, Defendant installed third-party tracking technologies such as the Meta Pixel ("Facebook Pixel" or "Pixel"), as well as Google Analytics and Google Tag Manager (together with Pixel, "Tracking Tools"), onto the Website. These Tracking Tools, such as pixels, web beacons, tags, and/or cookies, track and collect communications with the Defendant via the Website and

---

[1] www.clearblue.com/pregnancy-tests;  www.clearblue.com/ovulation-tests.  On information and belief, Defendant SPD sells Clearblue products in all 50 states, including California.

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

surreptitiously force the user's web browser to send those communications to undisclosed third parties, such as Facebook and/or Google. [2]

6.    Plaintiff and Class Members used the Website to submit information related to their past, present, or future health conditions, including reviewing and purchasing pregnancy, fertility and ovulation test kits. Such Private Information would allow the third party (e.g., Facebook or Google) to know that a specific customer had a specific type of reproductive health condition such as, for example, that they are pregnant and/or are trying to conceive.

7.    Facebook connects user data from Defendant's Website to the individual's unique Facebook ID (FID). The FID links the user to their Facebook profile, which contains detailed information about the profile owner's identity sufficient to identify them personally.

8.    Similarly, Google "stores users' logged-in identifier on non-Google websites…in its logs … Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads."[3]

9.    Facebook tracks and collects data even on people who do not have a Facebook account or have deactivated their Facebook accounts. Those individuals

---

[2] When used in the context of a screen or visual display, a "pixel" is the smallest unit in such a digital display. An image or video on a device's screen can be made up of millions of individual pixels. For example, the Facebook Pixel is a tiny image file that is so small as to be invisible to website users. It is purposefully designed and camouflaged in this manner so that website users remain unaware of it.

[3] *See Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) (order denying summary judgment and citing internal evidence from Google employees).

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

can find themselves in an even worse situation because even though their Private Information is sent to Facebook—without their consent—they cannot clear past activity or disconnect the collection of future activity since they do not possess an account (or an active account).[4]

10.    Then, completely unencumbered by any pretense of restriction or regulation, Facebook and Google, in turn, use that Private Information for various business purposes, including using such information to "improve" advertisers' ability to target specific demographics and selling such information to third-party marketers who target those Users online (through their Facebook, Instagram, Gmail and other social media and personal accounts):

> Along with encouraging businesses to spend ad dollars, Facebook also receives the transmitted data, and can use it to hone its algorithms. Facebook can also use data from the pixel to link website visitors to their Facebook accounts, meaning businesses can reach the exact people who visited their sites. The pixel collects data regardless of whether the visitor has an account.[5]

11.    Simply put, the health information disclosed through Facebook and Google tracking technologies is personally identifiable.

---

[4] In the past, these were referenced as "ghost accounts" or "shadow profiles." *See* Laura Hautula, *Shadow profiles: Facebook has information you didn't hand over*, CNET (April 11, 2018), https://www.cnet.com/news/privacy/shadow-profiles-facebook-has-information-you-didnt-hand-over/.

[5] *See* Colin Lecher & Ross Teixeira, *Facebook Watches Teens Online As They Prep For College*, THE MARKUP (Nov. 22, 2023), https://themarkup.org/pixel-hunt/2023/11/22/facebook-watches-teens-online-as-they-prep-for-college#:~:text=After%20signing%20into%20their%20ACT,re%20registering%20for%20the%20ACT (stating that "[b]usinesses embed the pixel on their own websites voluntarily, to gather enough information on their customers so they can advertise to them later on Meta's social platforms") (last visited July 14, 2024).

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

12.    In addition to the Tracking Tools, upon information and belief Defendant also installed and implemented Facebook's Conversions Application Programming Interface ("CAPI") on its Website servers.[6]

13.    Unlike the Facebook Pixel which co-opts a website user's browser and forces it to transmit information to Facebook in addition to the website owner, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interaction, including Private Information, records and stores that information on the website owner's servers, and then transmits the data to Facebook from the website owner's servers.[7, 8]

14.    Indeed, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[9]

15.    Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the website user that would prevent the Pixel from sending website users' Private Information to Facebook directly.

---

[6] "CAPI works with your Facebook pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/.

[7] https://revealbot.com/blog/facebook-conversions-api/.

[8] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels.", https://developers.facebook.com/docs/marketing-api/conversions-api.

[9]https://www.facebook.com/business/help/2041148702652965?id=818859032317965

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

16.     Defendant utilized the Pixel, CAPI and Google tracking tools data for marketing purposes to bolster their profits. The Tracking Tools and CAPI are routinely used to target specific customers by utilizing data and information from users' communications with the Website to build profiles for the purposes of retargeting and future marketing. Facebook and Google also use Plaintiff's and Class Members' Private Information to create targeted advertisements based on the reproductive health conditions and other information disclosed to Defendant.

17.     Information concerning a person's physical and mental health is among the most confidential and sensitive information in our society and the mishandling of such information can have serious consequences including, but certainly not limited to, discrimination in the workplace and/or denial of insurance coverage.[10]

18.     Simply put, if people do not trust that their sensitive private information will be kept private and secure, they may be less likely to seek medical treatment which can lead to much more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to unauthorized entities is vitally necessary to maintain public trust in the healthcare system as a whole.

19.     The United States Department of Health and Human Services (HHS) has established "Standards for Privacy of Individually Identifiable Health

---

[10] *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world* (Nov. 16, 2022), https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized."); *see also* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites* (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

20.    In addition, as explained further below, HHS has specifically warned healthcare regulated entities that tracking technologies like those used by Defendant transmit personally identifying information to third parties, including on the public portion of the website, and that such information should not be transmitted without a HIPAA-acceptable written authorization from patients.

21.    The Federal Trade Commission (FTC) has also warned healthcare entities that "even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule."[11]

22.    Despite these warnings, Defendant embedded hidden Tracking Tools and, upon information and good faith belief, CAPI, on the Website and its servers, essentially planting a bug on customers' web browsers that forced them to disclose private and confidential communications to third parties. Defendant did not disclose the presence of these Tracking Tools to their Website users and customers.

23.    Healthcare customers simply do not anticipate or expect that their trusted healthcare provider will send personal health information or confidential health information collected via its webpages to a hidden third party – let alone Facebook and Google, which both have a sordid history of privacy violations in

---

[11]    *See Use of Online Tracking* Technologies, (July 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

pursuit of ever-increasing advertising revenue – without the customers' consent. Neither Plaintiff nor any other Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook or Google.

24.     The incontrovertible need for data security and transparency is particularly acute when it comes to the rapidly expanding worlds of telehealth and diagnostic test kits delivered to consumers' homes.

25.     Garnering wide-spread adaptation during the COVID-19 pandemic, these self-collection or at-home testing kits form an important part of consumers' access to healthcare by removing the impediments of having to travel to visit with medical providers – not to mention that these kits allow for quick turnaround at often cheaper price points, in the (supposed) privacy of their own home.

26.     Despite these kits testing for extremely sensitive and personal issues like sexual and reproductive health, many of these at-home test kit retailers appear to value the collection and monetization of user data over all else.[12] And, the universe of data that these companies collect is extremely vast as at-home test providers (and the laboratories with which they partner) can collect personal and health data on their customers through several channels, including through an initial online symptom survey, purchase information, customer interactions with provider websites or apps, and test results.[13]

---

[12] *See, e.g., Top Mental Health & Prayer Apps Fail Spectacularly at Privacy, Security* (May 2, 2022), https://foundation.mozilla.org/en/blog/top-mental-health-and-prayer-apps-fail-spectacularly-at-privacy-security/.

[13] As noted by the FTC, at-home test kit providers should be upfront with customers about what data they collect, how it is stored and with whom it is shared. *See, e.g., Ovulation Tracking App Premom Will be Barred from Sharing Health Data for Advertising Under Proposed FTC Order,* https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-will-be-barred-sharing-health-data-advertising-under-proposed-ftc.

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

27.    Unfortunately, the process of searching for, researching, purchasing and using these kits is not as confidential a process as the manufacturers and retailers of these kits make it seem.

28.    An investigation by The Markup and KFF Health News found that many of the websites by which retailers advertised and sold these kits used certain tracking technologies to collect and to share confidential and protected health information with the biggest social media and advertising platforms, including Facebook and Instagram.[14]

29.    Rather than attempt to collect more and more confidential and protected health information, telehealth and diagnostic test kit companies should minimize data collection and storage to what is necessary to provide health care services. In practice, few do; rather, likely cognizant that consumers would not voluntarily provide this sensitive and protected information, these companies resort to doing so covertly by installing invisible tracking technologies on their websites to collect and monetize that data.[15]

30.    Moreover, many companies do not publicly disclose what types of data will be shared — for instance, whether it will include someone's contact information or aspects of their health data. By disclosing customer data to third parties for commercial use and providing little transparency into what data is shared and with whom, test providers make it more likely that sensitive data could be leaked, used to

---

[14]    *See* Darius Tahir and Simon Fondrie-Teitler, *Need to get Plan B or an HIV test online? Facebook may know about it*, KFF HEALTH NEWS & THE MARKUP (June 30, 2023),    https://kffhealthnews.org/news/article/drugstores-pixel-sensitive-data-social-media-companies/ ).

[15]    *See, e.g., supra,* n. 10. Moreover, the policies of many test providers fail to include specific limitations around data retention and deletion, instead relying on vague, catchall language.

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

discriminate, and/or sold (and re-sold) by data brokers without oversight or consent.[16]

31.    In fact, Clearblue assures website visitors in its "Consumer Health Data Privacy Policy" that "[w]e do not sell your Consumer Health Data. We also do not share your Consumer Data with any Third Parties or Affiliates."[17]

32.    As detailed herein, those statements are certainly suspect given Defendant's outrageous, illegal and widespread practice of surreptitiously collecting and disclosing Plaintiff's and putative Class Members' confidential Private Information to third party data brokers such as Facebook and Google.

33.    This is particularly egregious in cases where some of the data captured and disclosed to Facebook and Google concerns someone's pregnancy status, given that in the post *Roe v. Wade* world such information can be weaponized by states with abortion bans.[18]

34.    Defendant breached its statutory and common law obligations to Plaintiff and Class Members by, inter alia: (i) failing to adequately review their marketing programs to ensure the Clearblue Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share Users'

---

[16] Kaylana Mueller-Hsia & Laura Hecht-Fellala, *Evaluating the Privacy of At-Home Covid 19 Tests, The Tests Are Essential for Fighting the Pandemic, but Poor Privacy Policy Practices Could Discourage Some People from Using Them*, BRENNAN CENTER FOR JUSTICE (Jan. 19, 2021), https://www.brennancenter.org/our-work/analysis-opinion/evaluating-privacy-covid-19-home-tests#:~:text=To%20maximize%20privacy%20protections%2C%20test,however%2C%20adhere%20to%20these%20principles (last visited July 19, 2024).

[17] *See* https://www.clearblue.com/consumer-health-data-privacy-policy

[18] *See Data brokers resist pressure to stop collecting info on pregnant people* (August 1, 2022), https://www.politico.com/news/2022/08/01/data-information-pregnant-people-00048988.

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

Private Information; (iii) failing to obtain the prior written consent of Plaintiff and Class Members to disclose their Private Information to Facebook, Google and/or others before doing so; (iv) failing to take steps to block the transmission of Plaintiff's and Class Members' Private Information through Tracking Tools like the Facebook Pixel, Google Analytics or CAPI; (v) failing to warn Plaintiff and Class Members that their Private Information was being shared with third parties without express consent and (vi) otherwise failing to design and monitor the Clearblue Website to maintain the security, confidentiality and integrity of customer Private Information.

35.    As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) lack of trust in communicating with health providers online; (iii) emotional distress and heightened concerns related to the release of Private Information to third party data brokers, (iv) loss of benefit of the bargain; (v) diminution of value of their Private Information; (vi) statutory damages and (viii) continued and ongoing risk to their Private Information.

36.    Plaintiff therefore seeks on behalf of herself and a class of similarly situated persons, to remedy these harms and therefore asserts the following statutory claim against Defendant: Violation of California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*.

## PARTIES

37.    Plaintiff Lauren Wolf-Bond is, and at all relevant times was, a citizen of the State of California residing in San Diego County.

38.    Defendant SPD Precision Diagnostics GmbH is a Swiss company that does business across the country including the State of California, as Clearblue.

## JURISDICTION AND VENUE

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

39.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy exceeds the sum of $5,000,000 exclusive of interest, fees and costs, there are more than 100 putative Class Members and at least one Class Member is a citizen of a state different from Defendant.

40.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein from part of the same case or controversy.

41.     This Court has personal jurisdiction over Defendant because Defendant regularly conduct business in the State of California, and because Defendant has falsely advertised and sold its Clearblue products to consumers in the State of California and in this judicial district.

42.     Personal jurisdiction is also proper because Defendant has committed unlawful acts in the State of California and this judicial district and Plaintiff's claims arise out of such acts, and/or because Defendant has otherwise made or established contacts in the State of California and in this judicial district sufficient to permit the exercise of personal jurisdiction.

43.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

## COMMON FACTUAL ALLEGATIONS

**A. Federal Regulators Make Clear that the Use of Tracking Technologies to Collect & Divulge Private Information Without Informed Consent is Illegal.**

44.     The surreptitious collection and divulgence of Private Information is an extremely serious data security and privacy issue. Both the FTC and the Office for

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

Civil Rights ("OCR") of the HHS have, in recent months, reiterated the importance of and necessity for data security and privacy concerning health information.

45. For instance, the FTC recently published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted that "[h]ealth information is not just about medications, procedures, and diagnoses. ***Rather, it is anything that conveys information—or enables an inference—about a consumer's health***. Indeed, [recent FTC enforcement actions involving] *Premom*, *BetterHelp*, *GoodRx* and *Flo Health* **make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information.**"[19]

46. The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should ***not*** use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> **Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.**
>
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or***

---

[19] *See* Elisa Jillson, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases,* FTC Business Blog (July 25, 2023) (emphasis added), https://web.archive.org/web/20250310234552/https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

*software development kits on apps, watch out.*

[Recent FTC enforcement actions such as] *BetterHelp*, *GoodRx*, *Premom*, and Flo make clear that practices like that ***may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information***.[20]

47.     The federal government is taking these violations of health data privacy and security seriously as recent high-profile FTC settlements against several telehealth companies' evidence.  For example, last year the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive PHI with advertising companies and platforms, including Facebook, Google and Criteo, and reached a $7.8 million settlement with the online counseling service BetterHelp, resolving allegations that the company shared customer health data with Facebook and Snapchat for advertising purposes. And Easy Healthcare was ordered to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[21]

---

[20] *Id.* (emphasis added) (further noting that *GoodRx* & *Premom* underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC and, in some cases, the media, of disclosures of health information without consumers' authorization.

[21] *See How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, Health IT Security, https://healthitsecurity.com/features/how-ftc-enforcement-actions-will-impact-telehealth-data-privacy; *see also* Allison Grande, *FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-under-health-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale.");

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

48.     In July 2023, federal regulators sent a letter to approximately 130 healthcare providers warning them about using online tracking technologies that could result in unauthorized disclosures of Private Information to third parties. The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook Pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others." According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[22]

49.     Moreover, the Office for Civil Rights at HHS has made clear, in a recent bulletin titled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, that the transmission of such protected information violates HIPAA's Privacy Rule:

> **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations,

---

https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-final-approval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-will-be-barred-sharing-health-data-advertising-under-proposed-ftc.

[22] *See supra*, n. 10.

would constitute impermissible disclosures.[23]

50.    The OCR Bulletin discusses the harms that disclosure may cause persons:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma,***

---

[23] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.htm (noting that "IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.").

This guidance was vacated *in part* last year by the Federal District Court for the Northern District of Texas due to the court finding it to be the product of improper rulemaking and it is cited for reference only until the OCR updates its guidance, should it do so in the future. *See American Hosp. Ass'n. v. Becerra*, No. 4:23-cv-01110-P, ECF No. 67 (S.D. Tex., Jun. 20, 2024). Notably, the court's order found only that the OCR's guidance regarding covered entities disclosing to third parties users' IP addresses while users navigated *unauthenticated public webpages* ("UPWs") was improper rulemaking. The Order in no way affects or undermines the OCR's guidance regarding covered entities disclosing personal identifiers, such as Google or Facebook identifiers, to third parties while patients were making appointments for particular conditions, paying medical bills or logging into (or using) a patient portal. *See id*. at 3-4, 31, n. 8 (vacating the OCR guidance with respect to the "Proscribed Combination" defined as "circumstances where an online technology connects (1) an individual's IP address with (2) a visit to a UPW addressing specific health conditions or healthcare providers" but stating that "[s]uch vacatur is not intended to, and should not be construed as, limiting the legal operability of other guidance in the germane HHS document."). Furthermore, the FTC bulletin on the same topics remains untouched, as do the FTC's enforcement actions against healthcare providers for committing the same actions alleged herein).

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

***mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.*** Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.*** While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[24]

51.    Investigative journalists have published several reports detailing the seemingly ubiquitous use of tracking technologies on hospitals', health care providers' and telehealth companies' digital properties to monetize their Users' Private Information.

52.    For instance, in the aptly titled report *"Out of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies*, a joint investigation by STAT and THE MARKUP of 50 direct-to-consumer telehealth companies reported that telehealth companies or virtual care websites were providing sensitive medical information they collect to the world's largest advertising platforms.[25]

---

[24] *Id.* (emphasis added).

[25]    Todd Feathers, Katie Palmer (STAT) & Simon Fondrie-Teitler, *"Out Of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies: An investigation by The Markup and STAT found 49 out of 50 telehealth websites sharing health data via Big Tech's tracking tools*, The Markup (Dec. 13, 2022), https://themarkup.org/pixel-hunt/2022/12/13/out-of-control-dozens-of-telehealth-startups-sent-sensitive-health-information-to-big-tech-companies.

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

53.     Many telehealth sites had at least one tracker—from Meta, Google, TikTok, Bing, Snap, Twitter, LinkedIn and/or Pinterest—that collected patients' answers to medical intake questions.[26]

**B. Underlying Web Technology**

54.     To understand Defendant's unlawful data-sharing practices, it is important first to understand basic web design and tracking tools.

55.     Devices (such as a computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

56.     Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

57.     Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **Universal Resource Locator ("URL")**: a web address.

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL, GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers.

---

[26] *See id.* (noting that "[t]rackers on 25 sites, including those run by industry leaders Hims & Hers, Ro, and Thirty Madison, told at least one big tech platform that the user had added an item like a prescription medication to their cart, or checked out with a subscription for a treatment plan").

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[27]

58.    A user's HTTP Request essentially asks the Defendant's Website to retrieve certain information (such as "Early Digital Pregnancy Test" page). The HTTP Response sends the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the user's screen as they navigate Defendant's Website.

59.    Every website is comprised of Markup and "Source code." Source code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code. Source code is essentially the back of the website, and the user does not see what happens in the source code.

60.    Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. Defendant's implementation of the Tracking Tools is source code that does just that. The Tracking Tools act much like a traditional wiretap. When users and/or customers visit Defendant's Website via an HTTP Request to Clearblue server, the server sends an HTTP Response including the Markup that displays the webpage visible to the user and Source Code including the Tracking Tools. Thus, Defendant is in essence handing users a tapped

---

[27] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

phone, and once the webpage is loaded into the user's browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for Defendant and transmits those communications to third parties, including Facebook and Google.

61. Third party data brokers, like Facebook and Google, place third-party cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the data broker can uniquely identify the customer associated with the Private Information intercepted.

62. With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. This is why third parties bent on gathering Private Information, like Facebook, implement workarounds that savvy users cannot evade. Facebook's workaround, for example, is CAPI. CAPI is an effective workaround because it transmits information from Defendant's own servers and does not rely on the user's web browsers. CAPI "is designed to create a direct connection between [Website hosts'] marketing data and [Facebook]." Thus, the communications between customers and Defendant, which are necessary to use Defendant's Website, are received by Defendant and stored on its server before CAPI collects and sends the Private Information contained in those communications directly from Defendant to Facebook. Client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

63. While there is no way to confirm with certainty that a Website host like SPD has implemented workarounds like CAPI without access to the host server, companies like Facebook instruct Defendant to "[u]se the Conversions API in addition to the [] Pixel, and share the same events using both tools," because such a "redundant event setup" allows Defendant "to share website events [with Facebook]

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

that the pixel may lose."[28] Thus, it is reasonable to infer that Facebook's customers who implement the Facebook Pixel in accordance with Facebook's documentation will also implement the CAPI workaround.

64.     The third parties to whom a website transmits data through pixels and associated workarounds do not provide any substantive Website content relating to the user's communications. Instead, these third parties are typically procured to track user data and communications for marketing purposes of the website owner (i.e., to bolster profits).

65.     Thus, without any knowledge, authorization, or action by a user, a website owner like SPD can use its source code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the user's communications to third parties.

66.     In this case, Defendant employed the Tracking Tools (and likely CAPI) to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Facebook and Google.

67.     By contrast with Source Code, the Markup is the façade of the Website and what the user sees.

68.     As an example, a customer's HTTP Request seeks specific information from the Defendant's Website (e.g., "Pregnancy Tests" page), and the HTTP Response provides the requested information in the form of "Markup," forming the webpage's content and features.

69.     Therefore, when a customer visits https://www.clearblue.com and selects the "Pregnancy Tests" tab, the customer's browser automatically sends an HTTP Request to Defendant's web server. Defendant's web server automatically

---

[28] *See* https://www.facebook.com/business/help/308855623839366?id=818859032317965.

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

returns an HTTP Response, which loads the Markup for that webpage. The user only sees the Markup, not Defendant's Source Code or underlying HTTP Requests and Responses:



*Figure 1. Screenshot taken from the user's web browser using Google Developer Tools upon visiting https://www.clearblue.com/pregnancy-tests*

70.    The image above displays the Markup of Defendant's "Pregnancy Tests" webpage (on the left). Behind the scenes and in the backdoor of the webpage, tracking technologies like the Facebook Pixel and the Google Analytics tracking tools are embedded in the Source code (*see, e.g.,* Pixel transmissions on the right side of the image above), automatically transmitting what the customer does on Defendant's webpage and effectively opening a hidden spying window into the customer's browser.

**C. Tracking Tools**

71.    AdTech giants Facebook and Google offer their Tracking Tools as free software that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user communications and

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

activity on those platforms. The Tracking Tools are used to gather, identify, target, and market products and services to individuals.

72.    In general, Tracking Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, that webpage's URL and metadata, button clicks, etc. Advertisers, such as Defendant, can track other user actions and communications and can create their own tracking parameters by customizing the software on their website.

73.    When a user accesses a webpage that is hosting Tracking Tools, the user's communications with the host webpage are instantaneously and surreptitiously duplicated and sent to the third party. For example, the Facebook Pixel on Defendant's Website causes the user's web browser to instantaneously duplicate the contents of the communication with the Website and send the duplicate from the user's browser directly to Facebook's server.

74.    Google Analytics tracking tool is marginally different than the Facebook Pixel but essentially accomplishes the same goal, tracking what a user communicates to Defendant's website.[29]

75.    Notably, transmissions only occur on webpages that contain Tracking Tools. Thus, Plaintiff's and Class Member's Private Information would not have been disclosed to Facebook or Google via this technology but for Defendant's decisions to install the Tracking Tools on the Clearblue Website.

76.    The third parties to whom a website transmits data through Tracking Tools and associated workarounds like CAPI do not provide any substantive

---

[29] *Comparing Google Analytics vs Facebook Pixel*, Boltic, https://www.boltic.io/blog/google-analytics-vsfacebookpixel#:~:text=Google%20Analytics%20is%20a%20comprehensive,time%20on%20site%2C%20and%20conversions.&text=On%20the%20other%20hand%2C%20Facebook,user%20actions%20on%20your%20website. (last visited July 20, 2024).

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

Website content relating to the user's communications. Instead, these third parties are typically procured to track user data and communications for marketing purposes of the website owner (*i.e.,* to bolster profits).

77.    Thus, without any knowledge, authorization, or action by a user, website owners like Defendant can use their source code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to third parties.

**D. Defendant Disclosed Plaintiff's and Class Members' Private Information to Facebook and Google Using Tracking Tools**

78.    In this case, Defendant employed Tracking Tools to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Facebook and Google.

79.    Defendant's Source Code manipulates the user's browser by secretly instructing it to duplicate the user's communications (HTTP Requests) with Defendant and to send those communications to Facebook and Google. These transmissions occur contemporaneously, invisibly, and without the user's knowledge.

80.    Thus, without its customers' consent, Defendant has effectively used their source code to commandeer and "bug" or "tap" its customers' computing devices, allowing Facebook, Google, and other third parties to listen in on all of their communications with Defendant and thereby intercept those communications, including Private Information.

81.    The Tracking Tools allow Defendant to optimize the delivery of ads, measure cross-device conversions, create custom audiences for its ads, and decrease advertising and marketing costs. However, Defendant's Website does not rely on the Tracking Tools in order to function.

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

82.    While seeking and using Defendant's services and products, Plaintiff and Class Members communicated their Private Information to Defendant via the Clearblue Website.

83.    Plaintiff and Class Members were not aware that their Private Information would be shared with third parties as it was communicated to Defendant because, amongst other things, Defendant did not disclose this fact.

84.    Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to third parties, nor did they intend for anyone other than Defendant to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

85.    Defendant's Tracking Tools sent non-public Private Information to third parties like Facebook and Google, including but not limited to Plaintiff's and Class Members': (1) sensitive health conditions; (2) desired reproductive health products; (3) details of their activities on a specific Clearblue product's page and (4) the fact that they were proceeding to purchase a particular Clearblue product, including the specific retailer they chose.

86.    Importantly, the Private Information Defendant's Tracking Tools sent to third parties included personally identifying information that allowed those third parties to connect the Private Information to a specific user. Information sent to Facebook was sent alongside the Plaintiff's and Class Members' Facebook ID (c_user cookie or "FID"), thereby allowing individual customers' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Facebook accounts and therefore their identity.[30]

---

[30] Defendant's Website tracks and transmits data via first-party and third-party cookies. The c_user cookie or FID is a type of third-party cookie assigned to each person who has a Facebook account, and it is comprised by a unique and persistent set of numbers that can be easily used to look up that person's Facebook account by

87.    A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including location, pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook ID to locate, access, and view the user's corresponding Facebook profile quickly and easily.

88.    Similar to Facebook, the Private Information Defendant's Google Tracking Tools sent to third parties included personally identifying information that allowed those third parties to connect the Private Information to a specific customer. Information sent to Google was sent alongside the Plaintiff's and Class Members' unique identifier ("_ga" or "CID" cookies) , thereby allowing individual customers' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Google accounts and therefore their identity.[31]

89.    Google logs a user's browsing activities on non-Google websites and uses this data for serving personalized ads.

90.    Defendant deprived Plaintiff and Class Members of their privacy rights when they: (1) implemented Tracking Tools that surreptitiously tracked, recorded, and disclosed Plaintiff's and other online customers' confidential communications and Private Information; (2) disclosed customers' protected information to unauthorized third parties; and (3) undertook this pattern of conduct without

---

simply typing the numbers after www.facebook.com/ and hitting "Enter."

[31] *See Brown v. Google LLC*, 2023 WL 5029899, at fn. 11, *supra*, note 3 (quoting Google employee deposition testimony explaining how Google tracks user data).

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

notifying Plaintiff or Class Members and without obtaining their express written consent.

91.    By installing and implementing both Facebook tools and Google Analytics, Defendant caused Plaintiff's and Class Member's communications to be intercepted by and/or disclosed to Facebook and Google and for those communications to be personally identifiable.

92.    As explained herein, these unlawful transmissions are initiated by Defendant's source code concurrent with communications made via certain webpages.

**E. Defendant's Tracking Tools Disseminate Customer Information Via the Clearblue Website**

93.    An example illustrates the point. If a customer uses the Website to find a Clearblue product, Defendant's Website directs them to communicate Private Information, including the particular type of testing kit the customer is seeking (pregnancy, ovulation, fertility, and/or menopause). Unbeknownst to the user, each and every communication is sent to third parties, namely Facebook and Google, via Defendant's Tracking Tools, including the type of test kit the customer is interested in purchasing and whether they proceed to click the "Buy now" button for a specific Clearblue product.

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

94.     In the example below, the user navigated to the "Pregnancy Tests" page in Defendant's Website and chose the "Rapid Detection Pregnancy Test":



*Figure 2. Screenshot taken from the user's web browser using Google Developer Tools upon visiting https://www.clearblue.com/pregnancy-tests/rapid-detection*

95.     Unbeknownst to ordinary users, this webpage—which is undoubtedly used to communicate Private Information for the purpose of seeking reproductive health products—contains Defendant's Tracking Tools. The right side of the image shows the "behind the scenes" portion of the Website that is invisible to ordinary users. Importantly, each entry in the column represents just one instance in which Defendant's Tracking Tools sent this user's information to Facebook.

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

96.     If the user clicked the "See how to use" button for a specific Clearblue product, Defendant shared that information with Facebook as well:



*Figure 3. Screenshot taken from the user's web browser using Google Developer Tools upon visiting https://www.clearblue.com/pregnancy-tests/rapid-detection#how-to-use*

97.     The first line of Source code text, "id: 1030135040371132" refers to Defendant's Pixel ID and confirms that Defendant has downloaded the Facebook Pixel into their Source Code for this webpage.

98.     The second line of text, "ev: PageView," identifies and categorizes which actions the user took on the webpage ("ev=" is an abbreviation for event, and "PageView" is the type of event). Thus, this identifies the user as viewing the page with instructions on how to use the Clearblue Rapid Detection Pregnancy Test.

99.     The highlighted text shows Defendant has disclosed to Facebook that the user is interested in a particular product for detecting pregnancy.

100.   Finally, the last line of Source code text in the image above and the second line of text in the image below ("GET") demonstrate that Defendant's Pixel sent the user's communications, and the Private Information contained therein, alongside the user's Facebook ID (c_user ID), thereby allowing the user's communications and actions on the website to be linked to their specific Facebook profile.



*Figure 4. Screenshot of the details of the user's network traffic depicting the user's search results for how to use the Clearblue Rapid Detection Pregnancy Test, along*

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

1    *with the user's unique Facebook id contained in the c_user field under "Cookie."*
32

2    101.    To make matters worse, Defendant's Facebook Pixel also shared with

3    Facebook its customers' purchasing activities.

4    102.    If, following the examples above, the user clicked on the "Buy now"

5    button on the product's webpage, Defendant transmitted that information to

6    Facebook as well:



16    *Figure 5. Screenshot of the user's purchasing activity on the Clearblue Webpage
17    for the Rapid Detection Pregnancy Test.*

18    103.    In each of the examples above, the user's Website activity and the

19    contents of the user's communications are sent to Facebook alongside their

20    personally identifiable information. Several different methods allow marketers and

21    third-parties to identify individual website users, but the examples above

22    demonstrate what happens when the Website user is logged into Facebook on their

23    web browser or device. When this happens, the Website user's identity is revealed

24    via third-party cookies that work in conjunction with the Pixel.

---

26    32 The user's Facebook ID is represented as the c_user ID highlight in the image
    below, and Plaintiff has redacted the corresponding string of numbers to preserve
27    the user's anonymity.

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

104.   Facebook receives at least nine cookies when Defendant's Website transmits information via the Pixel, including the c_user, datr, and fr cookies, *Figure 6*:

| Name | Value | Domain | P... | Expires / N |
|------|-------|--------|------|-------------|
| ar_debug | 1 | .www.goog... | / | 2024-05-0 |
| presence | C%7B%22t3%22%3A%5B%... | .facebook.c... | / | Session |
| fr | 1tMv255TbPiAJFlQE.AWWP... | .facebook.c... | / | 2024-05-0 |
| wd | 1664x983 | .facebook.c... | / | 2024-02-1 |
| ps_l | 0 | .facebook.c... | / | 2025-03-0 |
| ps_n | 0 | .facebook.c... | / | 2025-03-0 |
| c_user | 5400 | .facebook.c... | / | 2025-02-0 |
| _ga_1W... | GS1.1.1707240937.2.1.1707... | .clearblue.c... | / | 2025-03-1 |
| datr | QtI1Y1IVd2UWOuuBmn2M... | .facebook.c... | / | 2024-04-0 |
| _pk_ses... | 1 | www.clearb... | / | 2024-02-0 |
| _pk_id.3... | db8ac7cef0b39bde.170723... | www.clearb... | / | 2025-03-0 |
| sb | GrxtY1jj9lKWnpCg7UAhiJMv | .facebook.c... | / | 2024-04-0 |
| _ga | GA1.1.1609766617.1707232... | .clearblue.c... | / | 2025-03-1 |
| xs | 7%3A_7bqKp6s0g6FyQ%3A... | .facebook.c... | / | 2025-02-0 |

105.   The "datr" cookie contains a unique alphanumeric code and identifies the specific web browser from which the user is sending the communication. It is an identifier that is unique to the user's web browser and is therefore a means of identification for Facebook. Facebook keeps a record of every datr cookie identifier associated with each of its users.

106.   The fr cookie, a unique combination of the c_user and datr cookies, contains an encrypted Facebook ID and browser identifier.[33] Facebook, at a minimum, uses the fr cookie to identify users, and this particular cookie can stay

---

[33] Data Protection Commissioner, *Facebook Ireland Ltd: Report of Re-Audit*, p. 33 (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

on a user's website browser for up to 90 days after the user has logged out of Facebook.[34]

107.    The datr and fr cookies are commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook. Although Facebook created these cookies, Defendant is ultimately responsible for the manner in which individual website users were identified via these cookies, and Facebook would not have received this data but for Defendant's implementation and use of the Pixel throughout the Clearblue Website.

108.    Defendant also revealed the Website visitors' identities via first-party cookies such as the _fbp cookie that Facebook uses to identify a particular browser and a user, *Figure 7*:[35]

| _fbp | fb.1.1707232235588.1640849696 | .clearblue.c... | / | 2024-05-06T17:3... |
|------|-------------------------------|-----------------|---|--------------------|

109.    The fbp cookie is a Facebook identifier that is set by Facebook source code and associated with Defendant's use of the Facebook Pixel program. The _fbp cookie emanates from Defendant's Website as a putative first party cookie but is transmitted to Facebook through cookie synching technology that hacks around the same-origin policy. Therefore, the _fbp cookie is transmitted to Facebook even when the user's browser is configured to block third-party tracking cookies.

110.    The _ga and _gid cookies operate similarly as to Google.

---

[34]    *Cookies    &    other    storage    technologies*, https://www.facebook.com/policy/cookies/.

[35] *Id.*

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

111.    The Facebook Pixel uses both first- and third-party cookies to link website visitors' communications and online activity with their corresponding Facebook profiles, and, because the Pixel is automatically programmed to transmit data via both first-party and third-party cookies, customers' information and identities are revealed to Facebook even when they have disabled third-party cookies within their web browsers.

112.    Plaintiff's counsels' investigation revealed that Defendant was also sending their customers' protected health information to Google via Google tracking tools including Google Analytics and Google Tag Manager.

113.    Google Tracking Tools installed on the Clearblue Website appear to collect the same types and categories of sensitive Private Information from Defendant's customers as the Facebook Pixel and, in some instances, even more data:



114.    The image above demonstrates that Google Analytics shares not only the name of the Clearblue testing product a customer is attempting to purchase, but also the retailer they chose to complete the purchase (here, Walgreens).

115.   As described *supra*, this information is shared with Google along with the CID, __ga and _gid cookies.

Defendant does not disclose that the Pixel, Google trackers, first-party cookies from third parties like Facebook and/or Google, or any other Tracking Tools embedded in the Website's source code track, record, and transmit Plaintiff's and Class Members' Private Information to Facebook and Google for targeted advertising. Moreover, Defendant never received consent or written authorization to disclose Plaintiff's and Class Members' private communications to Facebook or Google for marketing.

**F. Facebook's Platform & Its Business Tools**

116.   Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[36]

117.   In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilize its "Business Tools" to gather, identify, target and market products and services to individuals.

118.   Facebook's Business Tools are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

119.   The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, that webpage's Universal

---

[36] META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx, INVESTOR.FB.COM (last visited July 19, 2024).

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

Resource Locator ("URL"), metadata, button clicks, and other user interactions with a webpage.[37]

120.  Advertisers, such as Defendant, can track other user actions and can create their own tracking parameters by building a "custom event."[38]

121.  One such Business Tool is the tracking Meta Pixel which "tracks the people and type of actions they take."[39]

122.  When a user accesses a webpage that is hosting the Pixel, their communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook's servers—traveling directly from the user's browser to Facebook's server.

123.  This second, contemporaneous, and secret transmission contains the original GET request sent to the host website, along with additional data that the Pixels are configured to collect. This transmission is initiated by Facebook code and concurrent with the communications with the host website. Two sets of code are thus

---

[37] *Specifications for Facebook Pixel Standard Events*, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited July 19, 2024); *see* META PIXEL, GUIDES, ADVANCED, https://developers.facebook.com/docs/meta-pixel/advanced (last visited July 19, 2024); *see also* BEST PRACTICES FOR META PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last visited July 19, 2024); META MARKETING API, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited July 19, 2024).

[38] ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* META MARKETING API, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited July 19, 2024).

[39] RETARGETING, https://www.facebook.com/business/goals/retargeting (last visited July 19, 2024).

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code, and Facebook's embedded code.

124.    Accordingly, during the same transmissions, the Website routinely provides Facebook with its customers' Facebook IDs, IP addresses, and/or device IDs and the other information they input into Defendant's Website, including their searches for reproductive health products and the webpages they view.

125.    This is precisely the type of identifying information that HIPAA as well as the FTC Act and the FTC Health Breach Notification Rule require providers of health products to de-anonymize to protect the privacy of customers.[40] Plaintiff's and Class Members' identities can be easily determined based on the Facebook ID, IP address and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

126.    After intercepting and collecting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences. If the website visitor is also a Facebook user, the information collected via the Facebook pixel is associated with the user's Facebook ID that identifies their name and Facebook profile, i.e., their real-world identity.

127.    This disclosed PHI and PII allows Facebook to know that a specific customer is seeking confidential health care and the type of health care being sought (in the case of Defendant, purchasing sensitive reproductive health products including pregnancy, fertility, and menopause testing kits to diagnose and/or treat highly sensitive and private conditions).

---

[40] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html.

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

128.    Facebook then sells that information to marketers who will online target Plaintiff and Class Members with ads related to their specific health conditions.

129.    In fact, in an action pending against Facebook related to use of its Meta Pixel on a healthcare provider's website, Facebook explicitly stated it requires Pixel users to "post a prominent notice on every page where the pixel is embedded and to link from that notice to information about exactly how the pixel works and what is being collected through it, so it is not invisible."[41]

130.    By engaging in this improper sharing of information without Plaintiff's and Class Members' consent, Defendant breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed their Private Information.

**G. Defendant's Conduct Violated California Law**

131.    *i.* California law has established policies and procedures for the protection of the privacy of confidential communications.

132.    California Invasion of Privacy Act provides that "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is

---

[41] *See* Transcript of the argument on Plaintiff's Motion for Preliminary Injunction in *In re Meta Pixel Healthcare Litigation*, Case No. CV-22-03580-WHO (N.D. Cal. Nov. 9, 2022) (Hon. J. Orrick), at 19:12-18; *see also In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218 (N.D. Cal. Dec. 22, 2022).

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

punishable by a fine not exceeding two thousand five hundred dollars)." Cal. Penal Code § 631(a).

133. Section 631(a) is not limited to phone lines but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

134. Defendant's actions described herein violated CIPA because Defendant aided, employed, agreed with, and conspired with Facebook, Google and likely other third parties to track and intercept Defendant's customers' internet communications via the Tracking Tools while their customers were using the Website.

**H. Users' Reasonable Expectation of Privacy.**

135. Plaintiff and Class Members were aware of Defendant's duty of confidentiality when they sought sensitive reproductive health products from Defendant.

136. Indeed, at all times when Plaintiff and Class Members provided their Private Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Private Information with third parties for a commercial purpose unrelated to health care.

137. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

collects and shares that individual's data to be one of the most important privacy rights.

138.   For example, one Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[42]

139.   Personal data privacy and obtaining consent to share Private Information were material to Plaintiff and Class Members in their purchases of Defendant's reproductive health products, including their purchases of fertility, ovulation, and pregnancy tests.

**I.   Defendant Was Enriched and Benefitted from the Use of Tracking Tools and Unauthorized Disclosures.**

140.   The primary motivation and a determining factor in Defendant's interception and disclosure of Plaintiff's and Class Members' Private Information was to commit criminal and tortious acts in violation of federal and state laws as alleged herein, namely, the use of customer data for advertising in the absence of express written consent. Defendant's further use of the Private Information after the initial interception and disclosure for marketing and revenue generation was an invasion of Plaintiff's and Class Members' privacy.

141.   Defendant used the Tracking Tools on the Website for its own purposes of marketing and profits.

---

[42] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/.

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

142.   Defendant receives compensation from third parties like Facebook and Google in the form of enhanced advertising services and more cost-efficient marketing on third-party platforms in exchange for disclosing customers' personally identifiable health information.

143.   Based on information and belief, Defendant was advertising its products and services on Facebook, for one, and the Pixels were used to "help [Clearblue] understand which types of ads and platforms are getting the most engagement[.]"[43]

144.   Retargeting is a form of online marketing that targets users with ads based on their previous Internet communications and interactions.

145.   Upon information and belief, Defendant re-targeted customers and potential customers to get more people to use their services and purchase their products. These customers include Plaintiff and Class Members.

146.   By utilizing the Tracking Tools, Defendant's cost of advertising and retargeting was reduced, thereby benefitting and enriching Defendant.

**J.  Plaintiff's and Class Members' Data has Financial Value**

147.   Moreover, Plaintiff's and Class Members' Private Information had value and Defendant's interception and unauthorized disclosure thereof harmed Plaintiff and the Class.

148.   Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

149.   The value of health data in particular is well-known and has been reported on extensively in the media. For example, Time Magazine published an

---

[43] RETARGETING, https://www.facebook.com/business/goals/retargeting.

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[44]

150.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[45]

151.    Several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

152.    Facebook itself has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

153.    Tech companies are under particular scrutiny because they already have access to a massive trove of information about people, which they use to serve their own purposes, including potentially micro-targeting advertisements to people with certain health conditions.

154.    Policymakers are proactively calling for a revision and potential upgrade of the HIPAA privacy rules out of concern for what might happen as tech companies continue to march into the medical sector.[46]

155.    The Private Information at issue here is also a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use Private Information

---

[44] *See* https://time.com/4588104/medical-data-industry/ (last visited July 19, 2024).
[45]*See*    https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.
[46] *Id.*

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

to commit an array of crimes that include identity theft and medical and financial fraud.[47] A robust "cyber black market" exists where criminals openly post stolen PII and PHI on multiple underground Internet websites, commonly referred to as the dark web.

156.    While credit card information and associated IIHI can sell for as little as $1–$2 on the black market, health data can sell for as much as $363.[48]

157.    Personal health information is particularly valuable because criminals can use it to target victims with frauds that take advantage of their medical conditions.

158.    Personal health information can also be used to create fraudulent insurance claims and facilitate the purchase and resale of medical equipment, and it can help criminals gain access to prescriptions for illegal use or sale.

159.    Medical identity theft can result in inaccuracies in medical records, costly false claims, and life-threatening consequences. If a victim's health information is comingled with other records, it can lead to misdiagnoses or mistreatment.

160.    The FBI Cyber Division issued a Private Industry Notification on April 8, 2014 that advised the following:

> Cyber criminals are selling [medical] information on the
> black market at a rate of $50 for each partial EHR,
> compared to $1 for a stolen social security number or
> credit card number. HER can then be used to file
> fraudulent insurance claims, obtain prescription

---

[47]    FTC, *Warning        Signs        of        Identity        Theft,* https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft.
[48]    Center for Internet Security, *Data Breaches: In the Healthcare Sector,* https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/.

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

medication, and advance identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.

161.    Cybercriminals often trade stolen private information on the black market for years following a breach or disclosure. Stolen private information can be posted on the Internet, making it publicly available.

162.    Further, information that someone is pregnant is especially valuable to marketers, but its collection can create severe legal consequences, such as the potential for law enforcement to use this data to enforce abortion laws in states where abortion is illegal.[49]

163.    Defendant gave away Plaintiff's and Class Members' communications and transactions on the Website without permission.

164.    The unauthorized access to Plaintiff's and Class Members' Private Information has diminished the value of that information, resulting in harm to Users, including Plaintiff and Class Members.

## K. Defendant Used and Disclosed Plaintiff's and Class Members' Private Information Without Their Knowledge, Consent or Authorization

165.    The Tracking Tools incorporated into, embedded in, or otherwise permitted on Defendant's Website were invisible to Plaintiff and Class Members while using that Website. The Tracking Tools on Defendant's Website were seamlessly integrated into the Website such that there was no reason for Plaintiff or any Class Member to be aware of or to discover their presence.

---

[49] *See Perversely patient-centric? How data brokers figure out you're pregnant*, MM+M (August 8, 2022), https://www.mmm-online.com/home/channel/7-day-supply/perversely-patient-centric-how-data-brokers-figure-out-youre-pregnant/.

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

166.    Plaintiff and Class Members were shown no disclaimer or warning that their Private Information would be disclosed to any unauthorized third party without their express consent.

167.    Plaintiff and Class Members had no idea that their Private Information was being collected and transmitted to unauthorized third parties, especially notorious data collectors such as Facebook and Google.

168.    Because Plaintiff and Class Members had no idea of the presence of the Tracking Tools on Defendant's website, or that their Private Information would be collected and transmitted to Facebook and Google for advertising, they could not and did not consent to Defendant's conduct.

169.    Plaintiff and Class Members did not give consent or authorization for Defendant to disclose their Private Information to Facebook, Google or to any third party for marketing purposes.

**L. Plaintiff's Experience**

170.    Plaintiff Lauren Wolf-Bond has utilized Defendant's Website on several occasions to research and look up Clearblue ███████████.

171.    Plaintiff accessed Defendant's Website on her computer and mobile device and, as a condition of purchasing Defendant's products, Plaintiff disclosed her Private Information to Defendant.

172.    Specifically, Plaintiff used the Clearblue Website on May 5, 2024 and July 6, 2024, to look up the Clearblue ██████████████████████████ testing kit and to follow the "buy now" link in order to purchase this product on Amazon.

173.    Plaintiff has maintained an active Facebook account throughout the relevant period in this case, which she is perpetually logged into and which is registered under her legal name.

- 45 -

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

174. Plaintiff has maintained an active and valid Google account throughout the relevant period in this case.

175. The full scope of Defendant's interceptions and disclosures of Plaintiff's communications to Meta and Google can only be determined through formal discovery. However, Defendant intercepted at least the following communications about Plaintiff's prospective healthcare providers. The following long-URLs or substantially similar URLs were sent to Meta via the Pixel and to Google via Google Analytics:



176. Contemporaneously with the interception and transmission of Plaintiff's communications on https://www.clearblue.com/, Defendant also disclosed to Facebook Plaintiff's personal identifiers, including but not limited to her IP address and Facebook ID.

177. Similarly, Defendant disclosed to Google Plaintiff's communications with the Website concerning her personal health information, along with her Google identifiers.

178. Plaintiff reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

179. Plaintiff provided her Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

180. Further to the systematic process described herein, Defendant assisted Facebook and Google with intercepting Plaintiff's communications, including those

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

that contained personally identifiable information, personal health information and related confidential information.

181.  Defendant assisted these interceptions without Plaintiff's knowledge, consent or express written authorization.

182.  After intercepting and collecting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences. If the Website visitor is also a Facebook user, Facebook will associate the information that it collects from the visitor with a Facebook ID that identifies their name and Facebook profile, i.e., their real-world identity. A user's Facebook Profile ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta— or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

183.  Following her visits to Defendant's Website, Plaintiff observed advertisements on her Facebook account related to the products she sought and received through webpages she viewed and accessed on Defendant's Website, specifically ads for ▮▮▮▮▮▮▮▮▮ from other companies as well as ads for the Clearblue ▮▮▮▮▮▮.

184.  Defendant breached Plaintiff's right to privacy and unlawfully disclosed her Private Information to Facebook.

185.  Plaintiff has a continuing interest in ensuring that future communications with Defendant are protected and safeguarded from future unauthorized disclosure.

## CLASS ALLEGATIONS

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

186.    This action is brought by the named Plaintiff on her behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

187.    The California Class that Plaintiff seeks to represent is defined as follows:

> All natural persons who used Defendant's Website to purchase reproductive health products to diagnose sensitive health conditions and whose Private Information was disclosed or transmitted to Facebook, Google or any unauthorized third party.

188.    Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

189.    Plaintiff reserves the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

190.    **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 1 million customers that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

191.    **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting individual Class Members. These common questions include, but are not limited, to the following:

> a.    Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

b. Whether Defendant had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendant, violated its own privacy policy by disclosing the Private Information of Plaintiff and Class Members to third parties like Facebook and/or Google;

d. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

e. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information was being disclosed without their consent;

f. Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of customers' Private Information;

g. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Private Information belonging to Plaintiff and Class Members free from unauthorized disclosure;

h. Whether Defendant violated the statute asserted as claims in this Complaint;

i. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct.

j. Whether Defendant knowingly made false representations as to their data security and/or privacy policy practices;

k. Whether Defendant knowingly omitted material representations with respect to its data security or privacy policy practices; and

l. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Private Information.

192. **Typicality**: Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

193. **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

194. **Predominance**: Defendant has engaged in a common course of conduct toward Plaintiff and Class Members in that all the Plaintiff's and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including the Pixel Information Recipients, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

195. **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individuals actions or piecemeal litigation. Absent a class action, most Class Members would likely find the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

196. Defendant has acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

197. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information and not disclosing it to unauthorized third parties;

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

b. Whether Defendant breached a legal duty to Plaintiff and the Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

e. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

198.   Finally, all members of the proposed Class are readily ascertainable. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

## COUNT I

## VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code §§ 630, *et seq*.
### (On behalf of Plaintiff Lauren Wolf-Bond & the California Class)

199.   Plaintiff Lauren Wolf-Bond, on behalf of herself and the California Class, repeats the allegations contained in the paragraphs above as if fully set forth herein.

200.   The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code §§ 630 to 638.

201.   CIPA begins with its statement of purpose:

The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

- 51 -

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

CAL. PENAL CODE § 630.

> California Penal Code § 631(a) provides, in pertinent part:
>
> Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500)[.]

202.    A defendant must show it had the consent of *all* parties to a communication.

203.    The Statute of Limitations for claims brought under CIPA is one year. *See Ion Equip. Corp. v. Nelson*, 110 Cal. App. 3d 868, 880, 168 Cal. Rptr. 361, 367 (1980) (citing Cal. Code Civ. Proc., § 340). As Plaintiff visited the Website in May and July of 2024, her CIPA claim falls well within this Statute of Limitations.

204.    At all relevant times, Defendant aided, employed, agreed with, and conspired with Facebook, Google and likely other third parties to track and intercept Plaintiff's and California Class Members' internet communications while using the Website, specifically by installing and configuring the Tracking Tools to permit Facebook and Google to eavesdrop on and intercept in real-time the exact content of Plaintiff's and California Class Members' private communications with Defendant.

205.    The content of those conversations included Private Information, such as highly sensitive personal health information. Through Defendant's installation and configuration of the Tracking Tools on the Clearblue Website, these communications were intercepted by Facebook and Google during the

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

communications and without the knowledge, authorization, or consent of Plaintiff and California Class Members.

206. Defendant intentionally inserted an electronic device into their Website that, without the knowledge and consent of Plaintiff and California Class Members, transmitted the substance of their confidential communications with Defendant to third parties.

207. Defendant willingly facilitated Facebook's, Google's and other third parties' interception and collection of Plaintiff's and California Class Members' private medical information by embedding the Tracking Tools on the Website, thereby assisting Facebook's eavesdropping.

208. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Tracking Tools falls under the broad catch-all category of "any other manner":

  a. The computer codes and programs Facebook, Google and other third parties used to track Plaintiff's and California Class Members' communications while they were navigating the Website;
  b. Plaintiff's and California Class Members' browsers;
  c. Plaintiff's and California Class Members' computing and mobile devices;
  d. Facebook and Google's web and ad servers;
  e. The web and ad servers from which Facebook, Google and other third parties tracked and intercepted Plaintiff's and California Class Members' communications while they were using a web browser to access or navigate the Website;
  f. The computer codes and programs used by Facebook and other third parties to effectuate its tracking and interception of Plaintiff's and California Class Members' communications while they were using a browser to visit the Website; and
  g. The plan Facebook, Google and other third parties carried out to effectuate their tracking and interception of Plaintiff's and California Class Members' communications while they were using a web browser or mobile application to visit the Website.

209.   Defendant failed to disclose that it uses the Tracking Tools to track and automatically and simultaneously transmit highly sensitive personal communications to Facebook and Google for targeted advertising. Defendant is necessarily aware that these communications are confidential as its Website acknowledges the confidential nature of PHI and disclaims that it is being shared with unidentified third parties without Plaintiff's and California Class Members' express authorization.

210.   The user communication information that Defendant transmits while using the Pixel, Google Analytics and other tracking technologies constitutes personal health information.

211.   As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting third parties, including Facebook, Google and their agents, employees, and contractors to receive Clearblue customers' online communications in real time through its Website without their consent.

212.   When Facebook receives the content of these communications, Facebook is able to understand it. Not only is the Facebook ID assigned by Meta to its users, but Facebook processes the content to link it to individual Users and target advertising to them based on the disclosed communications.

213.   Similarly, Google uses disclosed communications and its own unique identifiers for web Users to target them with advertisements based on their health conditions.

214.   By disclosing Plaintiff Lauren Wolf-Bond and the California Class Members' private health information, Defendant violated Plaintiff's and California Class Members' statutorily protected right to privacy.

215.   As a result of the above violations and pursuant to CIPA Section 637.2, Defendant is liable to Plaintiff and California Class Members for treble actual

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

damages related to their loss of privacy in an amount to be determined at trial, or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

216.    Under the statute, Defendant is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

## **RELIEF REQUESTED**

217.    Plaintiff, on behalf of herself and the proposed Classes, respectfully requests that the Court grant the following relief:

a.    Certification of this action as a class action and appointment of Plaintiff and Plaintiff's counsel to represent the Class;

b.    A declaratory judgment that Defendant violated:  (1) the  California Invasion of Privacy Act, and (2) Plaintiff's and Class Members' privacy rights;

c.    An order enjoining Defendant from engaging in the unlawful practices and illegal acts described herein; and

d.    An order awarding Plaintiff and the Class: (1) actual or statutory damages; (2) punitive damages in an amount to be determined at trial; (3) prejudgment interest on all amounts awarded; (4) injunctive relief as the Court may deem proper;  (5) reasonable attorney fees and expenses and costs of suit pursuant to California Code of Civil Procedure § 1021.5 and/or other applicable law;  and

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E

(6) Such other and further relief as the Court may deem appropriate.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff, on behalf of herself and the proposed Class, demands a trial by jury for all claims asserted herein and so triable.

DATED: March 20, 2025

*/s/ Matthew Langley*
Matthew Langley, CA Bar No. 342846
matt@almeidalawgroup.com
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
T: 773-554-9354

David DiSabato*
ddisabato@sirillp.com
Tyler Bean*
tbean@sirillp.com
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, NY 10151
T: 929-677-5144

*admitted *pro hac vice*
*Attorneys for Plaintiff & the Classes*

**FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 2:24-cv-06525-WLH-E